**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ALABAMA**
**NORTHEASTERN DIVISION**

FILED

02 SEP -6  PM 4:0 ;

U.S. DISTRICT COURT
N.D. OF ALABAMA

Kl

| | | |
|---|---|---|
| **MICHELLE LEE MORGAN,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | Civil Action No. CV-01-S-2240-NE |
| | ) | |
| **METAL EXCHANGE CORPORATION,** | ) | |
| **and GREG HODGES,** | ) | **ENTERED** |
| | ) | |
| **Defendants.** | ) | ⊂⊃P 0 6 2002 |

**MEMORANDUM OPINION**

Plaintiff, Michelle Lee Morgan, sued her former employer, Metal Exchange Corporation, for subjecting her to a sexually hostile work environment and gender discrimination, including disparate treatment based upon her pregnancy, and then discharging her in retaliation for her complaints about the foregoing, all in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*[1]  Plaintiff additionally brought supplemental state law claims of negligent hiring, training or supervision, assault, battery, and invasion of privacy against the company, pursuant to 28 U.S.C. § 1367(a).  Plaintiff concurrently asserted her claims of assault, battery, and invasion of privacy against defendant Greg Hodges, as alleged agent of Metal Exchange Corporation.  The case presently is before the court on defendants' separate motions for summary judgment.  Upon consideration of the pleadings, evidentiary submissions, and briefs, the court concludes that Metal Exchange's motion for summary judgment should be granted.[2]  The court declines to rule on

---

[1]Congress added § 701(k), the "Pregnancy Discrimination Act," to Title VII in 1978, for the purpose of including "pregnancy, childbirth, or related medical conditions" in the prohibition against discrimination on the basis of a person's sex. *See* 42 U.S.C. § 2000e(k); *see also Armindo v. Padlocker, Inc.,* 209 F.3d 1319, 1320 (11th Cir. 2000); *Byrd v. Lakeshore Hospital,* 30 F.3d 1380, 1382 (11th Cir. 1994).

[2]Federal Rule of Civil Procedure 56(c) provides, in part, that summary judgment not only is proper, but "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to

34

defendant Hodges's motion for summary judgment, because plaintiff's supplemental state law claims shall be dismissed without prejudice to plaintiff's right to pursue such claims in an appropriate state forum, if she chooses to do so.

## I. SUMMARY OF FACTS

Metal Exchange Corporation purchases, refines, and then trades or sells scrap metal at its facility in Moulton, Alabama.[3]  Plaintiff was hired by the company during November of 1997, as a warehouse worker.[4]  Her duties included loading and unloading trucks and boxed materials, sorting scrap metal, and operating a forklift or "Bobcat" utility tractor, among other tasks.[5]  The Moulton facility at which plaintiff worked was an un-air-conditioned warehouse and adjoining "yard," where scrap metal and other raw materials were dumped by customers, for eventual sorting by Metal Exchange employees.[6]

Richie Terry was plaintiff's immediate supervisor.[7]  Plaintiff testified that she considered

---

judgment as a matter of law." Fed. R. Civ. P. 56(c). Thus, "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).

> In making this determination, the court must review all evidence and make all reasonable inferences in favor of the party opposing summary judgment.

> The mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case. The relevant rules of substantive law dictate the materiality of a disputed fact. A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor.

*Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (en banc) (quoting *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995)); *see also United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1437 (11th Cir. 1991) (en banc).

[3]Defendant Metal Exchange's evidentiary submissions, Tab B (Creel affidavit) ¶¶ 3-4.

[4]*Id.*, Tab A (Morgan deposition), at 25, 29-30.

[5]*Id.* at 30-32.

[6]*Id.*, Tab B (Creel affidavit) ¶ 4, Exhibit A.

[7]Plaintiff's evidentiary submissions, Tab 1 (Morgan deposition), at 37.

defendant Greg Hodges to be her "assistant supervisor,"[8] but her opinion is not supported by the facts. Hodges was a senior buyer of metals.[9] In that capacity, Hodges did work with plaintiff,[10] as well as other employees of the company, when she (or they) unloaded customer trucks outside the warehouse,[11] but plaintiff never reported to Hodges,[12] he never directed her to perform any job, and Hodges was never involved in any counseling or disciplining of plaintiff.[13]

The ultimate supervisor of all employees at the Moulton facility was general manager Mike Creel.[14] Creel maintained an "open door policy," meaning that employees were free to speak directly to him about any problems in the workplace.[15] Further, the company posted an EEOC poster describing prohibited discrimination and harassment on a bulletin board near the time clock,[16] and, provided employees a toll-free telephone number to contact the corporate director of human resources at the company's home office in St. Louis, Missouri.[17]

## A.    Plaintiff's Sexual Harassment Claims

Plaintiff seeks to hold Metal Exchange vicariously liable for the conduct of several co-employees and customers of her former employer. The most serious acts complained of were committed by defendant Greg Hodges: he made sexual comments on three occasions, and, touched plaintiff inappropriately on two occasions. Consequently, his conduct is addressed first.

---

[8]*Id.* at 208, 244.

[9]Defendant Metal Exchange's evidentiary submissions, Tab B (Creel affidavit) ¶ 8.

[10]Plaintiff's evidentiary submissions, Tab 1 (Morgan deposition), at 244.

[11]*Id.* at 29, 35, 114, 208.

[12]*Id.* at 244.

[13]*Id.* at 208-09.

[14]Defendant Metal Exchange's evidentiary submissions, Tab B (Creel affidavit) ¶ 3.

[15]*Id.* at ¶ 6.

[16]*Id.* at ¶ 5.

[17]*Id.* at ¶ 6.

3

### 1.   Hodges's inappropriate comments

The first statement by Hodges that plaintiff complains of was uttered during the Spring of 1999.[18] Plaintiff became involved in an argument with another employee, Greg Crowe, who called her a "Yankee red-headed bitch."[19]  She became upset and began to cry.[20]  Plaintiff discussed the incident with Hodges as they prepared to leave work at the end of the day.[21]  Hodges told plaintiff that, if she wanted to continue working for Metal Exchange, she should develop a "thicker coat of skin."[22]  (As discussed *infra*, plaintiff did not report this incident to any official at Metal Exchange until February of 2000, almost one year later.)

The second comment by Hodges occurred during the week preceding Thanksgiving during 1999.[23]  Plaintiff remarked that she was traveling to Chicago for the holiday,[24] and Hodges asked whether she intended to visit her former husband.[25]  When plaintiff acknowledged that she did, Hodges asked if she was going to "get some."[26]  Plaintiff retorted that it was none of Hodges's business.[27]  Hodges persisted in his boorish behavior, saying:  "You know you don't have to go all the way up there to get it.  You can get it any time from me"[28] (Again, as discussed *infra*, plaintiff did not complain about this incident until February of the following year.)

---

[18]Plaintiff's evidentiary submissions, Tab 1 (Morgan deposition), at 96.

[19]*Id.* at 96.

[20]*Id.* at 96-97.

[21]*Id.* at 98-99.

[22]*Id.* at 97.

[23]*Id.* at 109-110.

[24]Plaintiff's evidentiary submissions, Tab 1 (Morgan deposition), at 109.

[25]*Id.*

[26]*Id.*

[27]*Id.*

[28]Plaintiff's evidentiary submissions, Tab 1 (Morgan deposition), Exhibit 10 (plaintiff's EEOC charge).

The last statements by Hodges were made during December of 1999.[29]  While in his office outside the warehouse, Hodges propositioned plaintiff, saying:

> "How about me and you going to go to a hotel, getting naked, and taking care of business?" [Plaintiff] then asked him why didn't he go with his wife. He replied, "Since the change of life, I can't remember when I have gotten any." [Plaintiff] asked him if he talked to Robyn [Kelly], the secretary [at defendant's Moulton facility], the same way he talked to [plaintiff]. He replied, "No, because she's married. Why, are you going to try to get me for sexual harassment too?"[30]

### 2.    Hodges's offensive touchings

Hodges touched plaintiff's breasts on two occasions.[31]  Both incidents occurred in the same time frame, either December of 1999 or January of 2000.[32]  The first happened while plaintiff and Hodges were standing in front of a coffee station in Hodges's office.[33]  When she reached for the waist-high coffee pot in front of her, Hodges, who was to plaintiff's left, reached for something on the shelf above her[34] and, as he did, his elbow came into contact with plaintiff's breast "for a few seconds."[35]  Neither plaintiff nor Hodges said anything to one another at the time.[36]  Plaintiff did not immediately speak to anyone about the incident, other than Mikael Purser, who was a co-employee.[37]  Plaintiff told Purser that she believed Hodges had harassed her.[38]

The second touching occurred while plaintiff and Hodges were standing beside a box of

---

[29]*Id.* at 112.

[30]*Id.* at Exhibit 10 (plaintiff's EEOC charge).

[31]*Id.* at 74-82.

[32]*Id.* at 79.

[33]*Id.* at 74-75.

[34]Plaintiff's evidentiary submissions, Tab 1 (Morgan deposition), at 77.

[35]*Id.* at 78.

[36]Plaintiff's evidentiary submissions, Tab 1 (Morgan deposition), at 78.

[37]*Id.* at 79.

[38]*Id.* at 79.

metal scraps delivered by a customer.[39]  Plaintiff was leaning against the chest-high box, with her

breasts pressed against the side.[40]  Hodges's hands were gripping the top of the box, but one hand

slipped down the side and brushed plaintiff's breast.[41]  Only the back-side of Hodges's hand came

into contact with plaintiff's breast:  he did not grasp or touch her breast with his fingers.[42]  Plaintiff

immediately stepped away from the box.[43]  Again, neither said anything to the other at the time.[44]

Moreover, plaintiff never reported this incident to any official of Metal Exchange;[45] instead, she

spoke of it only to a co-worker, Mikael Purser, a girlfriend, and during her deposition in this case.[46]

### 3.    Plaintiff's complaints about Hodges's conduct

Plaintiff complained to general manager Mike Creel about Hodges's sexual comments, as

well as the coffee pot incident (in which Hodges's elbow came into contact with her left breast) on

March 16, 2000.[47]  Creel interviewed Hodges, Richie Terry, and Metal Exchange secretary Robyn

Kelly.[48]  Not surprisingly, Hodges denied plaintiff's allegations.[49]  Creel's investigation did not

confirm whether the incidents had occurred, but he nevertheless counseled Hodges against

---

[39]*Id.* at 80-81.

[40]*Id.* at 82-83.

[41]*Id.* at 84-85.

[42]Plaintiff's evidentiary submissions, Tab 1 (Morgan deposition), at 85.

[43]*Id.* at 86.

[44]*Id.* at 86.

[45]*Id.* at 88-89.

[46]*Id.* at 87-88.

[47] Defendant Metal Exchange's evidentiary submissions, Tab B (Creel affidavit) ¶ 14. During her deposition, plaintiff recalled telling Creel about her problems with Hodges in February of 2000. Plaintiff's evidentiary submissions, Tab 1 (Morgan deposition), at 88-89. Creel's notes do not mention Hodges touching plaintiff's breasts, but construing the evidence in a light most favorable to plaintiff, the court finds that the plaintiff did mention the "coffee pot incident" to Creel on March 16, 2000 (the date more favorable to plaintiff's case).

[48]Defendant Metal Exchange's evidentiary submissions, Tab B (Creel affidavit) ¶ 14.

[49]*Id.*

inappropriate sexual conduct in the workplace.[50]  Hodges acknowledged that he understood the nature of the counseling,[51] and apparently he did, because plaintiff admits that Hodges never again said anything that she considered offensive, nor touched her.[52]

### 4.    O'Dell's 1998 propositions

Plaintiff received a series of six notes from co-employee Robert O'Dell in early 1998, expressing his desire to develop an intimate relationship.[53]  The last note included a request by O'Dell to visit plaintiff's home, which she found particularly "creepy."[54]  Plaintiff took the notes to Robyn Kelly, who encouraged her to show them to Mike Creel.[55]  After plaintiff did so, Creel "had a talking with [O'Dell] and the notes stopped."[56]  Plaintiff testified that the issue "was resolved," and that she was satisfied with the manner in which Creel handled the situation.[57]  Nevertheless, plaintiff now asserts that O'Dell's behavior constituted actionable sexual harassment.[58]

---

[50]*Id.*

[51]*Id.*

[52]Plaintiff's evidentiary submissions, Tab 1 (Morgan deposition), at 123-24.

[53]*Id.* at 92.

[54]*Id.* at 95 and Exhibits 13 and 14 (O'Dell notes).  These exhibits are somewhat confusing, in that Exhibit 14 appears to be O'Dell's final note, but plaintiff asserts there were six notes, and that in the actual last note in time, O'Dell indicated that he planned to visit plaintiff at home.  At any rate, below is the text of the two notes that are in the record:

> Exhibit 13: "You look pretty today with your hair up.  I feel warm inside when I see you I want to put my arms around you and just to feel your body next to mine to feel the softness of your skin I would like to know what it feels like to be kissed by a pretty woman know a lady like you please say yes to a kiss for Christmas present[.]"

> Exhibit 14: "Michelle I am sorry that my note made you mad or hurt at me so I am sorry for what I said in my note that hurt you so this will be the last note that I will write you.  I am sorry for an old mans thoughts even though I don't know how to talk to you I am an old man who's fantasy run wild still I didn't mean to hurt you with what I wrote sorry and good by[.]"

> Plaintiff's evidentiary submissions, Tab 1 (Morgan deposition), Exhibits 13 and 14.

[55]Plaintiff's evidentiary submissions, Tab 1 (Morgan deposition), at 95.

[56]*Id.* at 92.

[57]Plaintiff's evidentiary submissions, Tab 1 (Morgan deposition), at 92, 95.

[58]*Id.* at 111.

### 4.      Urinating in public

Plaintiff also complains of three incidents in which she witnessed either a co-employee or customer urinating in the open, on company premises.[59]  (She does not claim to have seen exposed genitalia during any of these incidents.[60])

The first such incident occurred sometime in 1998, when plaintiff observed a co-employee, Greg Crowe, urinating in the scrap yard.[61]  Plaintiff was twenty or thirty feet behind Crowe when she realized what he was doing.[62]  Crowe subsequently was counseled by Creel about such behavior,[63] and plaintiff never again complained about Crowe relieving himself out of doors.[64]

Plaintiff later observed another co-employee, identified only as "Billy," urinating on company property,[65] but she did not complain about that incident prior to commencement of this action.[66]

Finally, in either December of 1999 or January of 2000, plaintiff observed a customer urinating in the company's parking lot.[67]  She was approximately five feet from the man at the time.[68]  When she reported the incident to Creel, he said that "maybe [she] should become a urinologist [sic]."[69]

## B.      Plaintiff's Gender Discrimination Claims

Plaintiff claims that she was treated differently from similarly-situated male employees.

---

[59]*Id.* at 100-02.

[60]*Id.*

[61]*Id.* at 99-100, 116.

[62]*Id.* at 104.

[63]Defendant Metal Exchange's evidentiary submissions, Tab B (Creel affidavit) ¶ 9.

[64]*Id.*

[65]Plaintiff's evidentiary submissions, Tab 1 (Morgan deposition), at 101-02.

[66]Defendant Metal Exchange's evidentiary submissions, Tab B (Creel affidavit) ¶ 11.

[67]Plaintiff's evidentiary submissions, Tab 1 (Morgan deposition), at 101, 116.

[68]*Id.* at 104.

[69]*Id.* at 91-92.

Specifically, she asserts that Metal Exchange discriminated against her by: allowing male employees to use the female restroom; denying her a pay raise; denying her equal opportunity to work overtime; and treating her pregnancy differently from the medical problems of male employees.

### 1.    Male employee use of the female restroom

The Moulton facility had two restrooms:  one designated for use by males, and the other for females.[70]  Plaintiff complains of being unable to use the female restroom on two or three occasions over the more than two-year course of her employment, due to it being occupied by male employees.[71]  More significant than this inconvenience, however, is the fact that plaintiff never complained to any company official about male employees' use of the female restroom.[72]

### 2.    Denial of a pay raise

Some employees were awarded a fifty-cent-per-hour pay raise during March 2000, but plaintiff was not among them.[73]  Notably, three male employees also did not receive the raise:  Buddy O'Dell, DeWayne Purser, and Shannon Schultz.[74]  Metal Exchange asserts that plaintiff and her male co-employees were denied a pay raise for the same reason:  each had received deficient work performance evaluations (plaintiff was rated "below average").[75]  Plaintiff nonetheless asserts that she was wrongfully denied a pay raise.[76]  She disputed that her work performance was "below average," and refused to sign the evaluation form prepared for her by Creel.[77]

---

[70]*Id.* at 124-25.

[71]Plaintiff's evidentiary submissions, Tab 1 (Morgan deposition), at 130.

[72]*Id.* at 125-126.

[73]*Id.* at 131-33.

[74]*Id.* at 133-34; *see also* defendant Metal Exchange's evidentiary submissions, Tab B (Creel affidavit) ¶ 15.

[75]Defendant Metal Exchange's evidentiary submissions, Tab B (Creel affidavit) ¶ 15.

[76]Plaintiff's evidentiary submissions, Tab 1 (Morgan deposition), at 131.

[77]*Id.* at 135-36.

### 3.    Denial of opportunities to work overtime

Plaintiff was denied the opportunity to work overtime on two or three Saturdays between February and May of 2000.[78]  (She did work Saturdays on three occasions during the same time period — February 21, March 13, and May 1, 2000 [79] — but she did not receive overtime pay in each instance, due to earlier absences which prevented the accumulation of forty hours of work during the normal work week.[80])

### 4.    Pregnancy discrimination: termination

Plaintiff learned that she was pregnant in January 2000.[81]  She did not immediately inform anyone at Metal Exchange of her pregnancy, other than co-worker Mikael Purser, who was the father of her child.[82]  The first notice to management occurred the following month, when plaintiff delivered to Mike Creel a letter from her attending physician, dated February 1, 2000, and stating in part: "She will be restricted for the remainder of her pregnancy to no strenuous activity[;] also she will need to have frequent rest and bathroom breaks.  She will be lifted from this restriction following the delivery of her child."[83]  Creel said that this restriction was "okay."[84]  At some point during the same month, Creel offered plaintiff the opportunity to take maternity leave,[85] but she declined.[86]

Plaintiff later delivered to Creel another letter from her physician, dated February 8, 2000,

---

[78]*Id.* at 127-28.

[79]Defendant Metal Exchange's evidentiary submissions, Tab B (Creel affidavit) ¶ 19.

[80]*Id.* and Exhibit E (plaintiff's 2000 attendance calendar).

[81]Plaintiff's evidentiary submissions, Tab 1 (Morgan deposition), at 45-46.

[82]*Id.* at 46.

[83]Defendant Metal Exchange's evidentiary submission, Tab A, (Morgan deposition) at 141,  Exhibit 20.

[84]Plaintiff's evidentiary submissions, Tab 1 (Morgan deposition), at 143.

[85]*Id.* at 156-57.

[86]*Id.*

and stating that she was restricted to lifting no more than fifteen pounds.[87] Metal Exchange had a

minimum lifting requirement of twenty-five pounds,[88] however, and Creel told plaintiff that she must

be able to lift at least that much in order to continue working full-time.[89] Plaintiff then had her

physician draft a third letter, dated February 11, 2000, which stated that he was "allowing her to lift

her normal 25 lbs."[90]

Plaintiff subsequently began to experience problems, impliedly as a result of her pregnancy,

including stomach cramps, light-headedness, and back pain.[91] She missed five days of work in April

and three in May.[92] On May 11, 2000, plaintiff telephoned Creel and told him that she was thinking

about quitting her job.[93] Later in the same day, however, plaintiff telephoned Creel again, saying that

she had changed her mind, and did not want to quit.[94] Creel replied, "okay."[95] She returned to work

the following day.[96]

About a week later, on May 18, 2000, plaintiff delivered to Creel a fourth letter from her

physician, dated May 16th, and stating that: "Due [to] medical complications she is having we are

requesting that she be put in a climate control area and also have S [sic] sedentary job. If one can

not be provided for her she will need to begin her maternity leave."[97] Plaintiff claims that she did

---

[87]Defendant Metal Exchange's evidentiary submission, Tab A (Morgan deposition), Exhibit 19.

[88]Id. at Tab B (Creel Affidavit) ¶ 7.

[89]Plaintiff's evidentiary submissions, Tab 1 (Morgan deposition), at 143-44.

[90]Defendant Metal Exchange's evidentiary submission, Tab A (Morgan deposition), Exhibit 18.

[91]Id. at Tab B (Creel Affidavit) ¶ 20.

[92]See Plaintiff's evidentiary submissions, Tab 1 (Morgan deposition), at 155; see also defendant Metal Exchange's evidentiary submission, Tab B (Creel affidavit) ¶ 19 and Exhibit E (plaintiff's 2000 attendance calendar).

[93]Plaintiff's evidentiary submissions, Tab 1 (Morgan deposition), at 149-50.

[94]Id.

[95]Id. at 158.

[96]Defendant Metal Exchange's evidentiary submissions, Tab B (Creel affidavit) ¶ 21.

[97]Id., Tab A (Morgan deposition), Exhibit 16.

11

not know what "sedentary" meant when her physician placed that restriction upon her continued employment, and that, if she had known, she would have asked him to change the restriction.[98]

Upon being presented with these restrictions, Creel asked plaintiff to leave work at 3:00 p.m. (she was paid for the remainder of the day), and to see him the following morning.[99] The warehouse and yard at Metal Exchange were not air conditioned, and plaintiff's job was not sedentary in nature.[100] Even so, plaintiff asserts that there were two "sedentary" jobs at Metal Exchange: writing down the weights of metals, and operating the bailer.[101] Neither of those jobs was performed in a "climate control[led] area," however.

The following day, May 19, 2000, Creel offered plaintiff a separation agreement which provided, among other things, for the company to pay for plaintiff's COBRA health insurance premiums through October 31, 2000, approximately one month after the anticipated birth of her child.[102] Plaintiff took the separation agreement and had a friend (identified only as "Tina") and a couple of lawyers review it.[103]

Plaintiff applied for state unemployment compensation on May 21, 2000, and the benefits ultimately were awarded.[104] Plaintiff picked up her last paycheck from Metal Exchange on May 25, 2000.[105] While doing so, Creel asked plaintiff whether she intended to execute the separation

---

[98]Plaintiff's evidentiary submissions, Tab 1 (Morgan deposition), at 144-45.

[99]*Id.* at 158; Defendant Metal Exhange's evidentiary submissions, Tab B (Creel affidavit) ¶ 23.

[100]Defendant Metal Exhange's evidentiary submissions, Tab B (Creel affidavit) ¶¶ 4, 22; Plaintiff's evidentiary submissions, Tab 1 (Morgan deposition), at 144-45.

[101]Plaintiff's evidentiary submissions, Tab 1 (Morgan deposition), at 144-47.

[102]Defendant Metal Exchange's evidentiary submission, Tab A, Exhibit 24.

[103]Plaintiff's evidentiary submissions, Tab 1 (Morgan deposition), at 167-68.

[104]*Id.* at 176-77 and Exhibit 25; Defendant Metal Exchange's evidentiary submissions, Tab B (Creel affidavit) ¶ 26.

[105]Defendant Metal Exchange's evidentiary submissions, Tab B (Creel affidavit) ¶ 25.

agreement.[106] Plaintiff said that she still was reviewing it, but did not mention that she already had applied for unemployment compensation benefits.[107] Several days later, Creel recorded a message regarding the agreement on plaintiff's telephone answering machine but, on the advice of her attorney, she did not return his call.[108] Plaintiff neither formally accepted nor rejected the separation agreement[109] — she simply refused to sign it, because she did not believe that it was fair.[110] She requested a cash distribution of her retirement savings plan on May 26, 2000.[111] She did not seek re-employment with Metal Exchange following the birth of her child.[112]

Plaintiff claims that she was subjected to disparate treatment on the basis of her gender, as compared to Metal Exchange's treatment of male employees with serious medical conditions, who were not offered severance packages.[113] Plaintiff points to co-worker Rickey McElwaney, who missed two to four months of work due to a heart condition, but his job was held open for him.[114] McElwaney also was permitted to take extensive leave from work on other occasions, due to his medical problems.[115]

Plaintiff filed a charge with the Equal Employment Opportunity Commission on November 13, 2000,[116] alleging sexual harrassment, gender discrimination (including pregnancy

---

[106]*Id.*

[107]*Id.* ¶¶ 25-27.

[108]Plaintiff's evidentiary submissions, Tab 1 (Morgan deposition), at 171, 179.

[109]*Id.* at 171-72.

[110]*Id.* at 169.

[111]Defendant Metal Exchange's evidentiary submissions, Tab B (Creel affidavit) ¶ 26.

[112]*Id.* ¶ 28.

[113]Plaintiff's evidentiary submissions, Tab 1 (Morgan deposition), at 35-36.

[114]*Id.*

[115]*Id.* at 36.

[116]Metal Exchange claims in its brief in support of summary judgment that the EEOC charge was filed on November 15, 2000, but plaintiff insists that she filed it on November 13, 2000. The dates stamped on all copies of the charge submitted to this court are not legible, but the court observes that the date typed in the box where plaintiff placed

discrimination), and retaliation.

## II. DISCUSSION

A plaintiff must satisfy a number of administrative prerequisites before filing a suit based upon Title VII. Foremost among these is the requirement that a charge of discrimination be submitted to the Equal Employment Opportunity Commission within 180 days "after the alleged unlawful employment practice occurred." 42 U.S.C. § 2000e-5(e)(1).

> Before a potential plaintiff may sue for discrimination under Title VII, she must first exhaust her administrative remedies. *See Crawford v. Babbitt*, 186 F.3d 1322, 1326 (11th Cir.1999). The first step down this path is filing a timely charge of discrimination with the EEOC. See 42 U.S.C. § 2000e-5(b) (1994); *Alexander v. Fulton County*, 207 F.3d 1303, 1332 (11th Cir.2000). For a charge to be timely in a non-deferral state such as Georgia [or Alabama], it must be filed within 180 days of the last discriminatory act. *See* 42 U.S.C. § 2000e-5(e)(1) (1994); *Howlett v. Holiday Inns, Inc.*, 49 F.3d 189, 197 (6th Cir.1995).

*Wilkerson v. Grinnell Corp.*, 270 F.3d 1314, 1317 (11th Cir. 2001); *see also, e.g., United Air Lines, Inc. v. Evans,* 431 U.S. 553, 555 n.4, 97 S.Ct. 1885, 1887 n.4, 52 L.Ed.2d 571 (1977) ("Timely filing is a prerequisite to the maintenance of a Title VII action.") (citation omitted); *see also, e.g., Alexander v. Fulton County*, 207 F.3d 1303, 1332 (11th Cir. 2000) ("No action alleging a violation of Title VII may be brought unless the alleged discrimination has been made the subject of a timely-filed EEOC charge.").

If a plaintiff fails to file a charge within this 180-day period, her claims may be procedurally barred for untimeliness. *See Delaware State College v. Ricks*, 449 U.S. 250, 256, 101 S.Ct. 498, 66 L.Ed.2d 431 (1980); *Everett v. Cobb County School District*, 138 F.3d 1407, 1410 (11th Cir. 1998).

---

her signature, and "declare[d] under the penalty of perjury that the foregoing is true and correct," is November 15, 2000. Even so, allowing plaintiff the benefit of the doubt as to the actual date of submission, in accordance with the standards for considering a summary judgment motion, the court adopts plaintiff's construction of facts. *See* Fed. R. Civ. P. 56(c); *see also Celotex,* 477 U.S. at 322 ("[t]he court must review all evidence and make all reasonable inferences in favor of the party opposing summary judgment.").

The Supreme Court has held that "filing a timely charge of discrimination with the EEOC is not a jurisdictional prerequisite to suit in federal court, but a requirement that, like a statute of limitations, is subject to waiver, estoppel, and equitable tolling." *Zipes v. Trans World Airlines*, 455 U.S. 385, 393, 102 S.Ct. 1127, 1132, 71 L.Ed.2d 234 (1982) (footnote omitted).  Once the issue is raised by a defendant, however, it is the plaintiff who bears the burden of proving that the administrative prerequisite was satisfied.

> [A] plaintiff must generally allege in his complaint that "all conditions precedent to the institution of the lawsuit have been fulfilled." If the defendant doubts the veracity of plaintiff's allegation, in whole or in part, then the defendant may deny "specifically and with particularity" that the preconditions have not been fulfilled. The plaintiff then bears the burden of proving that the conditions precedent, which the defendant has specifically joined in issue, have been satisfied.

*Jackson v. Seaboard Coast Line Railroad Company*, 678 F.2d 992, 1010 (11th Cir. 1982) (quoting Fed.R.Civ.P. 9(c)) (other citations omitted).[117]

Here, Metal Exchange "specifically and with particularity" denied that plaintiff's EEOC charge was timely.  *See* defendant's Answer (doc. no. 5), at 7 ("The plaintiff has failed to satisfy the administrative prerequisites, jurisdictional or otherwise, to maintaining some or all of the claims asserted.").[118]

## A.    The Timeliness of Some of Plaintiff's Claims

As previously noted, plaintiff filed her EEOC charge on November 13, 2000.[119]  Thus, to be deemed timely, the claims asserted in plaintiff's judicial complaint should be founded on events

---

[117]The *Jackson* Court also observed that, "[i]f, however, the defendant does not deny the satisfaction of the preconditions specifically and with particularity, then the plaintiff's allegations are assumed admitted, and the defendant cannot later assert that a condition precedent has not been met." *Jackson v. Seaboard Coast Line R. Co.*, 678 F.2d 992, 1010 (11th Cir. 1982) (citations omitted).

[118]*See also* defendant's Brief in Support of Summary Judgment (doc. no. 22), at 15 ("None of Morgan's allegations of sexual harassment occurred within 180 days prior to the filing of her November 15, 2000 EEOC charge.").

[119]*See supra* note 116.

15

occurring on or after May 17, 2000.  The only incidents complained of by plaintiff that occurred after

that date were those following plaintiff's delivery of her physician's fourth set of restrictions.  All

claims based upon events occurring more than 180 days prior to the filing of plaintiff's EEOC charge

are therefore due to be dismissed as untimely, *unless* plaintiff can demonstrate either that the

discriminatory character of the tardy claims was not readily apparent on the date each underlying

event occurred, or that the otherwise time-barred claims are substantially related to a timely-filed

claim.  *See, e.g., Miranda v. B & B Cash Grocery Store, Inc.*, 975 F.2d 1518, 1531 (11th Cir. 1992)

("Precedent in this circuit and the former Fifth Circuit has established that the limitations period is

tolled 'until the facts which would support a cause of action are apparent or should be apparent to

a person with a reasonably prudent regard for [her] rights.'") (quoting *Cocke v. Merrill Lynch & Co.*,

817 F.2d 1559 (11th Cir. 1987)); *Roberts v. Gadsden Memorial Hospital*, 835 F.2d 793, 799-800

(11th Cir.) ("It is only when a substantial nexus exists between a timely-filed claim and an otherwise

time-barred claim that they may be viewed as constituting a single violation, part of which falls

within the limitations period."), *modified on reh'g*, 850 F.2d 1549 (11th Cir. 1988).

　　　One equitable exception to the 180-day filing requirement is the so-called "continuing

violation doctrine." *See Berry v. Board of Supervisors*, 715 F.2d 971, 979 (5th Cir. 1983).  When

an employer has engaged in a series of discriminatory acts, with at least one of the acts occurring

within the 180-day filing window, then the plaintiff's claims *may be* considered timely as to all of

such acts. *See Roberts*, 835 F.2d at 799-800.  At a minimum, the plaintiff must establish that at least

one actionable violation of Title VII occurred within the 180-day filing window.  *See Evans,* 431

U.S. at 558, 97 S.Ct. at 1887 ("[T]he critical question is whether any present violation exists.");

*Coon v. Georgia-Pacific Corp.*, 829 F.2d 1563, 570 (11th Cir. 1987) (continuing violation doctrine

"relieves a plaintiff of the burden that all actionable conduct must have occurred within 180 days prior to the charge, so long as the complaint is timely as to the last occurrence"); *Lewis v. MacMillan-Bloedel, Inc.*, 670 F. Supp. 330, 335 (S.D. Ala. 1986) ("[A]n allegation of a continuing violation requires that there be in fact a *present violation* during the applicable 180-day time period.") (emphasis in original).

A pivotal consideration is whether the plaintiff has demonstrated a "substantial nexus" between the time-barred and timely-filed claims.

> The continuing violation doctrine does not exist to give a second chance to an employee who allowed a legitimate Title VII claim to lapse. It is only when a substantial nexus exists between a timely-filed claim and an otherwise time-barred claim that they may be viewed as constituting a single violation, part of which falls within the limitations period.

*Roberts*, 835 F.2d at 800. A problem often arises in determining whether a plaintiff has carried the "burden of proving the existence of a substantial nexus between the acts." *Id.* (citing *Milton v. Weinberger*, 645 F.2d 1070, 1077 (D.C. Cir.1981).[120] That is because "[c]ourts have not formulated a clear standard for determining when alleged discriminatory acts are related closely enough to constitute a continuing violation and when they are merely discrete, isolated, and completed acts which must be regarded as individual violations." *Berry*, 715 F.2d at 981.

In *Berry*, the Fifth Circuit listed a series of factors for district courts to consider when

---

[120]The *Roberts* Court cited *Milton v. Weinburger* for the following proposition:

In *Milton*, the District of Columbia Circuit refused to apply the continuing violation doctrine to resurrect several otherwise time-barred claims in which an employer denied promotions allegedly on the basis of race when the plaintiffs failed to allege a nexus between the events. The court noted that to allow a more liberal application of the doctrine would provide an end-run around the policy underlying Title VII's 180-day filing requirement: Protecting employers from the burden of having to defend against claims arising out of remote managerial decisions.

*Roberts*, 835 F.3d at 800.

attempting to determine whether a set of purportedly discriminatory acts are substantially related,

or whether they merely are discrete and individual violations:

> *The first is subject matter.* Do the alleged acts involve the same type of discrimination, tending to connect them in a continuing violation? *The second is frequency.* Are the alleged acts recurring (*e.g.*, a biweekly paycheck) or more in the nature of an isolated work assignment or employment decision? *The third factor*, perhaps of most importance, *is degree of permanence.* Does the act have the degree of permanence which should trigger an employee's awareness of and duty to assert his or her rights, or which should indicate to the employee that the continued existence of the adverse consequences of the act is to be expected without being dependent on a continuing intent to discriminate? As noted, the particular context of individual employment situations requires a fact-specific inquiry by a trial judge which cannot be easily reduced to a formula. We feel, however, that consideration of the above factors will generally be appropriate. . . .

*Berry*, 715 F.2d at 981-82 (emphasis supplied). The Eleventh Circuit has subsequently applied the

*Berry* analysis with approval. *See, e.g., Roberts*, 835 F.2d at 800-01.

Applying the *Berry* analysis to plaintiff's claims, the first inquiry is whether the subject

matter of the timely-filed claims involve the same type of discrimination as the acts outside the 180-

day administrative filing period. Here, plaintiff was offered a severance package on May 19, 2000,

in response to her physician's fourth letter, effectively restricting plaintiff from holding any available

job at Metal Exchange.[121] It would take a substantial inferential leap to construe that act as remotely

similar to any incident of sexual harassment or discrimination that occurred on a prior date. Stated

differently, the subject matter of the events occurring inside and outside the 180-day filing window,

if related at all, are connnected by only tenuous factual and legal threads.

The second prong of the *Berry* test analyzes the frequency of the alleged acts. In order to

meet the requirements of the "continuing violation" exception, "the alleged discriminatory actions

---

[121]As recorded in the text accompanying notes 100-101 *supra*, the warehouse and yard at Metal Exchange's Moulton facility were not air-conditioned, plaintiff's existing job was not sedentary in nature, and the two positions suggested by plaintiff as sedentary accommodations were not performed in a climate controlled area.

should not be isolated incidents, but should be recurring in order to satisfy the exception." *Johnson v. Woodruff,* 28 F. Supp. 2d 1248, 1251 (M.D. Fla. 1998). Here, plaintiff complains of several incidents of sexual harassment from early 1998 to January 2000, and, acts of gender discrimination based upon use of the female restroom by male employees, denial of a pay raise, and denial of opportunities to earn overtime compensation. These events are more in the nature of isolated occurrences than a recurring pattern.

The third, and probably most important, inquiry of the *Berry* test is whether the acts complained of were of such a nature that they should have triggered plaintiff's awareness of, and duty to assert, her federally protected rights. *See Berry,* 715 F.2d at 981-82. The following is a summary of the complained-of acts that occurred more than 180 days before plaintiff filed her EEOC charge:

      (1)    O'Dell's six notes were delivered in early 1998. Plaintiff complained to Metal Exchange management after the sixth note, corrective action was promptly taken, and the objectionable conduct stopped.

      (2)    Hodges's sexual harassment of plaintiff occurred between the Spring of 1999 and January of 2000. Plaintiff complained to Metal Exchange management in February 2000, corrective action was taken, and the offensive conduct ceased

      (3)    Plaintiff witnessed men urinating outdoors on three occasions between 1998 and January 2000. Plaintiff reported two of the incidents to Metal Exchange management, corrective action was taken with regard to the person over which general manager Creel had control (co-employee Greg Crowe), and the objectionable behavior ceased.

      (4)    Plaintiff was unable to use the female restroom two or three times between 1998 and May of 2000, because it was occupied by a male employee. Plaintiff never complained to Metal Exchange management, however.

      (5)    Plaintiff was denied a pay raise in March of 2000. She immediately complained to Mike Creel, but still was denied the raise (as were three male employees), due to a "below average" work performance evaluation.

      (6)    Plaintiff was denied the opportunity to work overtime on two or three

Saturdays between February and May 2000. Plaintiff complained to management about some of those lost opportunities during March or April 2000.

Thus, with the sole exception of the trivial inconvenience of being denied access to the female restroom on two or three occasions during the more than two year period of her employment with Metal Exchange — about which plaintiff never complained to management — all of the foregoing incidents share common threads: each incident was of such a nature as to put plaintiff on clear notice that she should complain and, in fact, she lodged complaints with management. To allow plaintiff to assert the continuing violation doctrine under these circumstances would be contrary to binding precedent. The Eleventh Circuit has repeatedly held that "[t]he continuing violation doctrine is premised on the 'equitable notion that the statute of limitations ought not to begin to run until facts supportive of the cause of action are or should be apparent to a reasonably prudent person similarly situated.'" *Hipp v. Liberty National Life Insurance Co.,* 252 F.3d 1208, 1222 (11th Cir. 2001) (quoting *Alldread v. City of Grenada,* 988 F.2d 1425, 1432 (5th Cir. 1993)) (internal quotation marks omitted). The *Hipp* opinion expands on this point by holding that "[t]his circuit . . . [has] recognized this underlying premise in holding that "[a] claim arising out of an injury which is 'continuing' only because a putative plaintiff knowingly fails to seek relief is exactly the sort of claim that Congress intended to bar by the 180-day limitation period." *Hipp,* 252 F.3d at 1222 (quoting *Roberts,* 850 F.2d at 1550). The purpose of the continuing violation doctrine is to permit a plaintiff to bring suit on acts for which the discriminatory nature was not readily apparent on the date each occurred. *See Hipp,* 252 F.3d at 1222 (citing *Doe v. R.R. Donnelly & Sons Co.,* 42 F.3d 439, 446 (7th Cir. 1994)).

In summary, plaintiff has not demonstrated a substantial nexus between her timely-filed claim and otherwise time-barred claims. *See Berry,* 715 F.2d at 981-82. Further, the continuing violation doctrine is not appropriately invoked by a plaintiff who had knowledge of the discriminatory nature

of the acts complained of, but failed to file a timely charge. *See Hipp*, 252 F.2d at 1222. Accordingly, plaintiff's Title VII claims based upon those events occurring before May 17, 2000 are procedurally barred, and are due to be dismissed.

**B.     The Sufficiency of Plaintiff's Sexual Harassment Claims**

A plaintiff desiring to establish a hostile work environment claim must show that: (1) she belongs to a protected group; (2) she was subjected to unwelcome sexual harassment; (3) the harassment was based upon the plaintiff's sex; (4) the harassment was sufficiently severe or pervasive as to alter the terms and conditions of the plaintiff's employment; and (5) there is a basis for holding the employer responsible under either a theory of vicarious or direct liability. *See, e.g., Faragher v. City of Boca Raton*, 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998); *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998); *Johnson v. Booker T. Washington Broadcasting Service, Inc.*, 234 F.3d 501, 508 (11th Cir. 2000); *Mendoza*, 195 F.3d at 1245; *Gupta v. Florida Board of Regents*, 212 F.3d 571, 582 (11th Cir. 2000); *Cross v. State of Alabama*, 49 F.3d 1490, 1504 (11th Cir. 1995); *Bell v. Crackin Good Bakers, Inc.*, 777 F.2d 1497, 1502-03 (11th Cir. 1985); *Henson v. City of Dundee*, 682 F.2d 897, 903-05 (11th Cir. 1982).

Of these elements, the fourth — the requirement that a plaintiff demonstrate that the harassment complained of was sufficiently severe or pervasive as to alter the terms and conditions of her employment — is regarded as "crucial." *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 81, 118 S.Ct. 998, 1003, 140 L.Ed.2d 201 (1998); *see also Gupta*, 212 F.3d at 583 (observing that fourth element is the one that "tests the mettle of most sexual harassment claims"). And, it is the fourth element on which plaintiff's sexual harassment claims falter. This court agrees with the argument of defendant Metal Exchange that plaintiff's sexual harassment claims are not

actionable, even if they had been timely filed, and therefore adopts those portions of defendant's brief as the opinion of this court.

## C.    Timely Filed Charges

In response to plaintiff's Title VII claim based upon those events occurring within the 180-day filing window — *i.e.*, that she was terminated and offered a discriminatory severance package on or about May 19, 2000 — Metal Exchange argues that plaintiff was terminated solely because her medical restrictions precluded her from performing any available position in the company.[122] Plaintiff counters by arguing that such treatment differed from that which the company accorded similarly situated male employees. She further argues that such treatment was in retaliation for her previous complaints of harassment and disparate treatment.

### 1.    Termination and offer of severance package

When a plaintiff contends that her discharge violated Title VII, courts generally require the plaintiff to demonstrate that: (1) she was a member of a class of persons protected by the statute; (2) she was qualified for the position from which he was discharged; (3) despite her qualifications, she nevertheless was terminated; and (4) following her discharge, the defendant either replaced her with someone outside the protected class, or retained other employees who were not within the protected class, and who possessed comparable or lesser qualifications. *See, e.g., Jones v. Bessemer Carraway Medical Center*, 137 F.3d 1306, 1311 n.6 (11th Cir. 1998); *Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181, 1185 (11th Cir. 1984); *Whiting v. Jackson State University*, 616 F.2d 116, 121 (5th Cir. 1980). Three of these four elements of a prima facie case do not merit extended discussion. Plaintiff was a pregnant female on the date of her discharge, and clearly was

---

[122]*See* defendant's brief in support of summary judgment (doc. no. 22), at 24.

a member of a protected class. *See* 42 U.S.C. §§ 2000e–2(a)(1), 2000e(k); *see also, e.g., Armindo v. Padlocker, Inc.,* 209 F.3d 1319, 1320 (11th Cir. 2000); *Byrd v. Lakeshore Hospital,* 30 F.3d 1380, 1382 (11th Cir. 1994). Further, although it is unclear whether plaintiff was replaced by a male employee, it is evident that Metal Exchange retained numerous male employees with similar qualifications. The second element requires closer scrutiny, however.

Ordinarily, the court may infer that an employee who currently holds a position is qualified to hold that position. *See Crapp v. City of Miami Beach,* 242 F.3d 1017, 1020 (11th Cir. 2001). The Eleventh Circuit has recognized that, "in cases where a plaintiff has held a position for a significant period of time, qualification for that position sufficient to satisfy the test of a *prima facie* case can be inferred." *Rosenfield v. Wellington Leisure Products, Inc.,* 827 F.2d 1493, 1495 n.2 (11th Cir. 1987). Even so, it is undisputed that the medical restrictions requiring that plaintiff work only in a "climate control[led] area," performing "sedentary" duties, represented a significant and material change in plaintiff's ability to perform the duties of her job position. Plaintiff does suggest two "sedentary" jobs at Metal Exchange — recording the weights of metals and operating the bailer — but neither of those jobs was performed in a "climate control[led] area." She has not suggested any available job at Metal Exchange which she was qualified to perform that was consistent with both restrictions.

Shifting the frame of reference slightly, the Eleventh Circuit recently held that a plaintiff seeking to "make out a prima facie case of *disparate treatment discrimination*" in the termination of employment "must generally show that (1) plaintiff is a member of a protected class; (2) plaintiff suffered an adverse employment action; (3) *the employer treated similarly situated employees outside of the protected class more favorably*; and (4) plaintiff was qualified to do the job." *Scott*

*v. Suncoast Beverage Sales, Ltd.*, 295 F.3d 1223, 1228 (11th Cir. 2002) (emphasis supplied) (citing

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973);

*Crapp v. City of Miami Beach*, 242 F.3d 1017, 1020 (11th Cir. 2001)).  Under this formulation of

a prima facie case, plaintiff cannot demonstrate the third element.  Plaintiff has not shown that her

treatment was less advantageous than that accorded similarly-situated, male co-workers.  Plaintiff

claims to have been similarly situated to two male co-employees, Gerald McElwaney and Fordyce

Moore, both of whom had suffered from serious medical problems, but were not terminated.  Even

so, the evidence shows that plaintiff was not similarly situated to either man.  Plaintiff was not

similarly situated to McElwaney for two reasons:  McElwaney returned to his job with no restrictions

on the type of work that he could perform; and, McElwaney applied for re-employment following

his illness, while plaintiff did not.  Plaintiff is not similarly situated to Moore for the simple reason

that Moore never returned to work following his illness.  Thus, plaintiff possibly is in a better

position than Moore, in that she was offered health insurance for several months following her

termination, while there is no evidence that Moore was offered this same benefit.  Accordingly,

plaintiff has not demonstrated a prima facie case of wrongful termination under either formulation

of a prima facie case, and summary judgment is due to be granted on this claim.

### 2.    Retaliation claim

Plaintiff alternatively contends that her discharge was in retaliation for her complaints of

harassment and gender discrimination.[123]  "Retaliation is a separate violation of Title VII."  *Gupta,*

212 F.3d at 586.  Section 704(a) of Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e-

3(a)) provides protection for employees who complain or otherwise attempt to rectify an employer's

---

[123]Complaint (doc. no. 1), ¶¶ 30-32.

discriminatory practices.

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment... because he [the employee] has opposed any practice made an unlawful employment practice by this subchapter [of Title VII], or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter [of Title VII].

42 U.S.C. § 2000e-3(a).

In order to state a prima facie retaliation claim, a plaintiff must establish three elements: (1) she engaged in a statutorily protected activity; (2) she suffered an adverse employment action; and (3) there was a causal linkage between the protected activity and the adverse employment action. *See, e.g., Bass v. Board of County Commissioners,* 256 F.3d 1095, 1117 (11th Cir. 2001); *Gupta,* 212 F.3d at 587; *Farley v. Nationwide Mut. Ins. Co.,* 197 F.3d 1322, 1336 (11th Cir. 1999); *Wideman v. Wal-Mart Stores, Inc.,* 141 F.3d 1453, 1455 (11th Cir. 1998); *Little v. United Technologies,* 103 F.3d 956, 959 (11th Cir.1997); *Meeks v. Computer Associates Int'l,* 15 F.3d 1013, 1021 (11th Cir. 1994); *Goldsmith v. City of Atmore,* 996 F.2d 1155, 1163 (11th Cir. 1993).

In addition, when (as here) a plaintiff's retaliation claim is based upon conduct falling under the opposition clause of 42 U.S.C. § 2000e-3(a), the plaintiff must further demonstrate a good faith, reasonable basis for her belief that the conduct complained of constituted a violation of Title VII, as distinguished from proving that the employer actually engaged in an unlawful employment practice. *See, e.g., Gupta,* 212 F.3d at 586 ("To recover for retaliation, the plaintiff need not prove the underlying claim of discrimination which led to her protest, so long as she had a reasonable good faith belief that the discrimination existed.") (quoting *Meeks,* 15 F.3d at 1021) (internal quotation marks omitted); *Wu v. Thomas,* 863 F.2d 1543, 1549 (11th Cir. 1989) ("[P]laintiff need only have had a 'reasonable belief' that an unlawful employment practice was occurring."). For purposes of

25

summary judgment the court assumes that plaintiff possessed a good faith, reasonable basis for her complaints to Mike Creel through 2000, and that she therefore has satisfied this element of her prima facie case. Further, plaintiff's termination and offer of a severance package undoubtedly constituted an adverse employment action. The causation element of plaintiff's claim is more problematic, however.

In order to defeat summary judgment, plaintiff must provide evidence of a causal linkage between her protected activity and the adverse employment action; otherwise, the court must dismiss the claim. *See, e.g., Bailey v. USX Corp.,* 850 F.2d 1506, 1508 (11th Cir. 1998); *McCollum v. Bolger,* 794 F.2d 602, 610 (11th Cir. 1986); *Hamm v. Board of Regents,* 708 F.2d 647, 654 (11th Cir. 1983). The causation requirement is not a heavy burden; rather, "a plaintiff merely has to prove that the protected activity and the negative employment action are not completely unrelated." *Meeks,* 15 F.3d at 1021 (quoting *EEOC v. Reichhold Chem., Inc.,* 988 F.2d 1564, 1571-72 (11th Cir. 1993)).

Defendant's general manager, Mike Creel — the person who terminated plaintiff and offered her a severance package — unquestionably was aware of plaintiff's earlier complaints, since those complaints usually were made directly to him.[124] Plaintiff complained to Creel about Hodges' sexual harassment on March 16, 2000.[125] Her complaints concerning her observation of a customer urinating in the company parking lot occurred during either December of 1999, or January or February of 2000.[126] Thus, there was approximately a two-to-three month temporal gap between plaintiff's complaints and the date on which she was offered a severance agreement. A close temporal proximity between two events "may support a finding of a causal connection between those

---

[124]Defendant Metal Exchange's evidentiary submissions, Tab B, (Creel Affidavit) ¶¶ 9-30.

[125]*Id.* at ¶ 14.

[126]Plaintiff's evidentiary submissions, Tab 1 (Morgan deposition), at 91, 100-01, 116.

two events." *Wascura v. City of South Miami,* 257 F.3d 1238, 1244-45 (11th Cir. 2001) (citing *Brungart v. BellSouth Telecommunications, Inc.,* 231 F.3d 791, 799 (11th Cir. 2000) (stating "[t]he general rule is that close temporal proximity between the employee's protected conduct and the adverse employment action is sufficient circumstantial evidence to create a genuine issue of material fact of a causal connection")).

When the temporal proximity between protected activity and an adverse employment action is the basis for concluding that a causal nexus exists, however, the temporal gap must be "very close." *See O'Neal v. Ferguson Construction Co.,* 237 F.3d 1248, 1253 (10th Cir. 2001) ("Unless there is a very close temporal proximity between the protected activity and the retaliatory conduct, the plaintiff must offer additional evidence to establish causation."). Courts have interpreted "very close" to mean a period of less than three months in some circumstances. *See Wascura,* 257 F.3d at 1245, 1248; *Anderson v. Coors Brewing Co.,* 181 F.3d 1171, 1179 (10th Cir. 1999) (holding that three month period, standing alone, is insufficient to establish causation).

Here, the temporal proximity between plaintiff's complaints and Metal Exchange's termination of her employment varies with the claims that she asserts. Viewing the evidence in a light most favorable to plaintiff, however, it is arguable that she presents a prima facie case for retaliation on at least some of her claims, based solely upon their temporal proximity to her termination. *See Wascura,* 257 F.3d at 1244-45.

Assuming that plaintiff establishes a prima facie case of unlawful retaliation, at least as to her most recent complaints, the burden of production shifts to defendant, who must articulate a legitimate, nondiscriminatory reason for the challenged employment action. If that burden is met, plaintiff must produce evidence indicating that defendant's stated reason is mere pretext for unlawful

27

retaliation.

> Once plaintiff establishes a prima facie case [of retaliation] by proving only that the protected activity and the negative employment action are not completely unrelated, the burden shifts to the defendant to proffer a legitimate reason for the adverse action. . . . The burden then shifts back to the plaintiff to prove by a preponderance of the evidence that the "legitimate" reason is merely pretext for prohibited, retaliatory conduct.

*Sierminski v. Transouth Financial Corporation*, 216 F.3d 945, 950 (11th Cir. 2000) (citations omitted); *see also, e.g., Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir. 1997) (noting that a plaintiff must put on enough evidence to permit a jury to reasonably "conclude that the employer's proffered 'legitimate reasons were not what actually motivated its conduct'") (quoting *Cooper-Houston v. Southern Railway Company*, 37 F.3d 603, 605 (11th Cir. 1994)).

As its proffered legitimate reason for plaintiff's termination, Metal Exchange has provided proof that she was accommodated on three occasions for her pregnancy, and that she was only terminated when her physician's fourth set of restrictions disqualified her from holding any available job position at the company's Moulton facility. Conversely, plaintiff has not provided any proof to discredit Metal Exchange's stated reason for her termination. Plaintiff has not demonstrated that she was treated worse than allegedly, similarly-situated male employees, and she has not established that there were other jobs available in defendant's facility that could be performed in a "climate control[led] area." Accordingly, summary judgment is due to be granted.

### III. CONCLUSION

For the foregoing reasons, Metal Exchange's motion for summary judgment is due to be granted on all of plaintiff's Title VII claims. With the dismissal of plaintiff's Title VII claims, the

stated basis for this court's jurisdiction ceases to exist.[127]   The court, therefore, exercises its discretion and dismisses plaintiff's supplemental state law claims without prejudice to her right to pursue those claims in an appropriate state forum. *See* 28 U.S.C. § 1367(c)(3) ("The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if . . . the district court has dismissed all claims over which it has original jurisdiction. . . ."); *Carnegie-Mellon Univ. v. Cohill,* 484 U.S. 343, 350 n.7, 108 S.Ct. 614, 619 n.7, 98 L.Ed.2d 720 (1988) ("[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine-judicial economy, convenience, fairness, and comity-will point toward declining to exercise supplemental jurisdiction over the remaining state-law claims."). The court similarly declines to rule on defendant Greg Hodges's motion for summary judgment in deference to the appropriate state forum for resolution of those state law claims.

An order consistent with this memorandum opinion shall be issued contemporaneously herewith.

DONE this ___6th___ day of September, 2002.

_____
United States District Judge

---

[127]Plaintiff premised subject matter jurisdiction of her claims upon 28 U.S.C. §§ 1331, 1343, and 1367, and, 42 U.S.C. §§ 1981 and 2000e *et seq. See* Complaint ¶ 2.